KSC/07.06.23



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | | |
|---|---|---|---|
| Kim Y. Oldham | Mailing Address: | Office Location: | DIRECT: 410-209-4944 |
| Assistant United States Attorney | 36 S. Charles Street, 4th Floor | 36 S. Charles Street, 4th Floor | MAIN: 410-209-4800 |
| Kim.Oldham@usdoj.gov | Baltimore, MD 21201 | Baltimore, MD 21201 | FAX: 410-962-3124 |

July 6, 2023

Teresa Whalen, Esq.
Eugene Gorokhov, Esquire

<u>Via Electronic Mail</u>

    Re:   <u>United States v. Tyrik Braxton aka "Son Son"</u>
             Criminal No. JRR-21-494

Dear Counsel:

      This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Tyrik Braxton (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by July 31, 2023, it will be deemed withdrawn. The terms of the Agreement are as follows:

Offense of Conviction

      1.    The Defendant agrees to plead guilty to Count Five of the Indictment, which charges the Defendant with Use and Discharge of a Firearm During a Crime of Violence Resulting in Death, in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 924(j). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

Elements of the Offense

      2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland, the Defendant with respect to Count Five:

        a.   committed a federal crime of violence;
        b.   discharged a firearm during or in furtherance of such a crime;
        c.   death resulted by the use of the firearm; and
        d.   the death was caused by murder as defined in 18 U.S.C. §1111.

Penalties

3. The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 5 | 18 U.S.C. §§ 924(c), 924(j) | 10 years | Life | 5 years | $250,000 | $100 |

  a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

  b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

  c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

  d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

  e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

  f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

   e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

   f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

a. This Office and the Defendant agree that the applicable base offense level is **43** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2K2.1(c)(1)(B) and § 2A1.1 based on the fact that the defendant aided and abetted the use a firearm in connection with the commission of murder for hire, and death resulted.

b. This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the

offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

        c.       Therefore, the total offense level is **40.**

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Rule 11(c)(1)(C) Plea

9. The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of between **240 and 300** months in the custody of the Bureau of Prisons is the appropriate disposition of this case taking into consideration the nature and circumstances of the offense, the Defendant's criminal history, and all of the other factors set forth in 18 U.S.C. § 3553(a). This Agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this Agreement, except under the circumstances noted below, either party may elect to declare the Agreement null and void. Should the Defendant so elect, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that if the Court finds that the Defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth herein, neither the Court nor the Government will be bound by the specific sentence contained in this Agreement, and the Defendant will not be able to withdraw his plea.

## Obligations of the Parties

10. At the time of sentencing, this Office and the Defendant will recommend a total sentence between **240 and 300 months** of imprisonment in the custody of the Bureau of Prisons. This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

### Waiver of Appeal

11. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

    b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

        i. The Defendant reserves the right to appeal any sentence that exceeds 300 months; and

        ii. This Office reserves the right to appeal any sentence below 240 months.

    c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Forfeiture

12. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities.

14.     The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

15.     The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

16.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Restitution

17.     The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Defendant's Conduct Prior to Sentencing and Breach

18.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will

cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

19. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

20. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. In the event that the Court rejects this Agreement, except under the circumstances noted above, either party may elect to declare the Agreement null and void. Should the Defendant so elect, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). If the Defendant chooses to continue with his plea even though the Court has rejected the 11(c)(1)(C) term, the Court will have the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

21 This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

_____/S/_____
Kim Y. Hagan
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

July 20, 2023
Date

_____
Tyrik Braxton

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

7/20/23
Date

_____
Counsel for Tyrik Braxton

9

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Defendant, Tyrik Braxton, aka "Son Son," with the intent that a murder be committed in violation of the laws of the state of Maryland as consideration for the receipt of money, used and caused another to use a cell phone and a Honda Crosstour, both facilities of interstate commerce. During the course of that murder for hire, the Defendant aided and abetted his co-conspirators who discharged firearms, and death resulted from those discharges (i.e., the death of Ross). That death was a murder as defined by 18 U.S.C. § 1111.

On October 4, 2020 at approximately 2:38 p.m. hours, the Howard County Police ("HCPD") responded to 9687 Basket Ring Rd, Columbia, Maryland for the report of a shooting. The address is part of the Verona Apartment complex in a neighborhood of Howard County known as Oakland Mills. Upon arrival, officers observed a black male lying on the sidewalk in front of 9689 Basket Ring Rd. The victim was identified as 23-year-old Juan Michael Ross ("Ross") and pronounced dead at the scene. Investigators recovered two different types of shell casings from the scene - 9 mm and .40 caliber. According to the autopsy, Ross was shot eight times. Six of the gunshot wounds were to Ross's head, indicating a clear intent to kill Ross.

Following the murder, witnesses gave descriptions of two shooters that got out of a suspect vehicle, described as both being young black male suspects approximately 5'10" to 6' tall, thin build:

    Suspect #1 – black hoodie, blue surgical mask, black boots (referred to in the Indictment as Co-conspirator 2)
    Suspect #2 - red hoodie (Co-Conpirator 3)

A witness to the murder conducted an internet search on their cellphone to identify the type of vehicle driven by the suspects. The witness was standing with Ross when the murder occurred. Investigators retrieved a screenshot of a Honda Crosstour from the witness's cellphone. Witnesses at the crime scene described the path driven by the suspect vehicle as it left the area.

Investigators checked for video footage at the Walgreens Drug Store located off Thunder Hill Road, located approximately one-tenth of a mile from Route 175 and 1 mile from the murder scene. They identified a vehicle matching the suspect vehicle enter the store parking lot at 2:07 p.m., a half hour before the murder. The following additional observations of the Walgreens video footage were made:

Subject #1, BRAXTON, exited the driver's seat of the car, and walked with a noticeable limp into the Walgreen's store. BRAXTON purchased an Uber card and could be seen talking on

a cellphone as he walked out of the store. BRAXTON admits that he is the subject in the surveillance video purchasing the Uber gift card.

Subject #2/Co-conspirator 2 exited the passenger side rear, indicating that someone was already seated in the front passenger seat. Investigators believe that front passenger to be Co-conspirator 3. BRAXTON handed something to Subject #2/Co-Conspirator 2, who then got into the driver's seat. The Crosstour drove off at 2:15 p.m. (back to the Verona Apartments complex) and BRAXTON walked off camera view.

Investigators obtained purchase information from Uber about the gift card bought at Walgreen's by BRAXTON at 2:12 p.m. The prepaid card was linked to an account under the name Ty Ty with a phone number (202) 221-0101 which investigators were able to attribute to BRAXTON. According to Uber, there were two separate Uber trips on this account requested on the day of the murder. At 2:13 p.m., BRAXTON requested to be picked up at the Walgreen's and driven to a relative's residence at 6161 Quiet Times, Columbia, MD. The Uber driver described the rider as walking with a limp and appearing worried. At 4:16 p.m., BRAXTON requested to be picked up from 6161 Quiet Times and driven to Twin Rivers Rd in Columbia. An Uber driver picked up BRAXTON at 4:19 p.m. During the drive, BRAXTON changed his destination and went to Shipley's Grant Shopping Center located at the 5700 block of Richards Valley Rd, Ellicott City, MD. BRAXTON got out of the Uber car, met with a female in a car and grabbed something from her bag that BRAXTON then put in his pocket. BRAXTON got back into the Uber car. Both cars left immediately. The Uber driver then drove BRAXTON to his final requested destination of 1907 Lemmon St in Baltimore, an area he was known to frequent.

Immediately following the murder, investigators learned from various individuals that Co-Conspirator 1 hired someone to kill Ross because Co-Conspirator 1 suspected that Ross was a "snitch." The Defendant admits that he participated in the murder of Ross with Co-Conspirator 1 and Co-Conspirator 3.

Below is a text message exchange from October 3, 2020 (the day before the murder) recovered from the (202) 221-0101 cellphone used by BRAXTON. The text message exchange is between the (202) 221-0101 cellphone used by BRAXTON and (443) 365-9356, the cellphone number used by Co-Conspirator 1:

| | |
|---|---|
| Co-Conspirator 1: | Naw real shit bro I don't think u know how serious I am |
| (202) 221-0101: | I believe u bro we going show u our work if I gotta do it myself |
| Co-Conspirator 1: | Bro can it be done while I'm gone bro<br>I be back Monday[1] |

---

[1] Investigators learned that Co-Conspirator 1 was out of town for the weekend when Ross was murdered.

On that same date, the cellphone number (202) 221-0101 used by BRAXTON and (443) 673-7753 used by Co-Conspirator 3 exchanged the following text messages:

| | |
|---|---|
| SON SON: | Want the addy for the 6 |
| Co-Conspirator 3: | What addy? |
| SON SON: | 9665 basket ring apt 3 |
| Co-Conspirator 3: | Rd |
| SON SON: | Ima show u who they is |
| Co-Conspirator 3: | Rd |
| SON SON: | Fya |
| SON SON: | He trying to get it done ASAP rocky |

The text messages were recovered from Co-Conspirator 3's cellphone in which he had the (202) 221-0101 cellphone number used by BRAXTON saved in the contacts as "Son Son."[2]

The address 9665 Basket Ring, Apt 3 is in the Verona Apartment complex where Ross was killed. This apartment was leased to a friend of Co-conspirator 1's girlfriend. This friend knew Ross well and Ross was known to hang out the apartment almost daily. BRAXTON admits that he texted this address to Co-Conspirator 3 in order to find Ross.

On the day of the murder, at 1:54 p.m., the user of (202) 221-0101, BRAXTON, conducted a search on that cellphone for the address "9665 Basket Ring road, Columbia." At 1:56 p.m., both the (202) 221-0101 cellphone used by BRAXTON and Co-Conspirator 3's cellphones were in the immediate area of the shooting. The men were looking for Ross. At approximately 1:59 p.m., Ross posted an Instagram photo of himself walking to the Verona Apartments. At 2:07 p.m., both Co-Conspirator 3's and the (202) 221-0101 cellphone used by BRAXTON were in the area of the Walgreen's store where BRAXTON purchased the Uber card. Co-Conspirator 3's cellphone was back in the area of the homicide at 2:37 p.m. BRAXTON agrees that after locating Ross, BRAXTON and Co-Conspirator 3 went to Walgreen's so that BRAXTON could request an Uber and leave the area, while Co-Conspirator 2 and Co-Conspirator 3 went back to the Verona Apartments to murder Ross.

At approximately 4:35 p.m., an individual sent a photo to the (202) 221-0101 cellphone used by BRAXTON. The photo depicted the crime scene that included Ross's body still on the ground surrounded by police personnel and crime scene tape. Later that night, the (202) 221-0101 cellphone used by BRAXTON texted a cellphone number attributed to Co-Conspirator 1 that he had something important to discuss. Co-conspirator 1 requested to Facetime.

---

[2] Investigators learned that BRAXTON goes by the nickname "Son Son."

On October 6, the cellphone number (202) 221-0101 used by BRAXTON texted Co-conspirator 1 to call him "ASAP," and then again on October 7, "it's going to be hot as shit out here" to which Co-conspirator 1 replied, "It already is bro."

On November 20, 2020, HCPD executed a series of search warrants that included the residence of Co-Conspirator 1's mother. Investigators recovered the (443) 365-9356 cellphone known to be used by Co-Conspirator 1. Cellphone number (202) 221-0101 known to be used by BRAXTON was saved in Co-Conspirator 1's cellphone as "LIL Ty." Investigators also executed a search warrant at 305 W. Fayette St Unit 1213 in Baltimore, the residence of BRAXTON. BRAXTON was present in bedroom 1 and placed under arrest. During the execution of this warrant, detectives seized the following:
- Springfield XD .45ACP handgun serial number XD644106 with magazine and ammunition, located under the mattress in bedroom 1.
- Blue North Face backpack containing $2134 in U.S. currency, located under the bed in bedroom 1.
- Apple iPhone 7 located next to the bed in bedroom 1.

A photo of Co-Conspirator 1 was located on BRAXTON's Apple iPhone and multiple photos of BRAXTON and Co-Conspirator 3 were recovered from Co-Conspirator 3's cellphone. BRAXTON admits that he knew both Co-Conspirator 1 and Co-Conspirator 3 and that they were in fact his conspirators n the murder for hire of Juan Ross.

SO STIPULATED:

/S/
Kim Y. Hagan
Assistant United States Attorney

Tyrik Braxton
Defendant

Counsel for Tyrik Braxton