**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION
TOWER II, 9TH FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201-2705
TEL: (410) 962-3962
FAX: (410) 962-0872
TOLL FREE: (855) 213-8450

JAMES WYDA
FEDERAL PUBLIC DEFENDER

SHARI SILVER DERROW
ASSISTANT FEDERAL PUBLIC DEFENDER

**VIA CM/ECF**

February 13, 2024

The Honorable Julie R. Rubin
United States District Court
        for the District of Maryland
101 West Lombard Street
Baltimore, Maryland 21201

        Re:   *United States v. Jourdain Larose*, No. JRR-21-0494

Dear Judge Rubin:

        We write in advance of Jourdain Larose's sentencing hearing, scheduled for February 27, 2024. As the Court is aware, Mr. Larose has pleaded guilty to use and discharge of a firearm during a crime of violence resulting in death, in violation of 18 U.S.C. §§ 924(c) & (j). ECF No. 117. The parties have agreed pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of no more than 480 months of incarceration is the appropriate disposition in this case. *Id.* ¶ 9. Mr. Larose is free to argue for a reasonable sentence and period of supervised release. For the reasons stated below, the Court should accept the parties' plea pursuant to Rule 11(c)(1)(C) and sentence Mr. Larose to 25 years of incarceration, followed by 5 years of supervised release—the high end of the "c-plea" range called for by the plea agreement for co-defendant Tyrik Braxton, whose conduct was equally culpable as that of Mr. Larose.

        There is a clear dividing line in Mr. Larose's life—everything that happened before the devastating earthquake in Haiti, which in 2010 claimed the lives of more than 200,000 people,[1] with then-14-year-old Mr. Larose bearing witness to the carnage, and all that came after. After the earthquake, Mr. Larose was forced to process the grief and trauma of the death and devastation he had witnessed on his own. He never received any counseling, nor was he given the opportunity to talk about what happened in a therapeutic setting. He turned to marijuana and

---

[1]     United Nations, *UN marks anniversary of devastating 2010 Haiti earthquake* (Jan. 12, 2022), *available at* https://news.un.org/en/story/2022/01/1109632.

gambling to distract his mind and numb his pain. Within a few years, he picked up two juvenile charges, both of which resulted in probationary sentences, but nevertheless effectively ended his dream of playing college football.

In a show of remarkable resilience, Mr. Larose still managed to graduate high school and enrolled in community college. But right as he was embarking on young adulthood, he incurred two criminal charges in close succession for non-violent, low-level drug charges. Those charges limited his future employment opportunities, just as he was becoming a father and looking for lawful ways to support his family. By the time of the offense conduct in this case, Mr. Larose was using marijuana constantly and struggling with a gambling addiction.

Mr. Larose is acutely aware that there are no excuses for his actions in this case. He will live for the rest of his life with the knowledge and weight that he played a part in the loss of human life. He apologizes profusely to the loved ones of Juan Ross for their tremendous loss. Knowing that he cannot change the past, Mr. Larose is focused on the future, taking accountability for his actions, and using the time ahead to better himself.

This Court should impose a 25-year sentence, which will not result in Mr. Larose's release until approximately 2045, at which time he will be 50 years old, his mother will be 65 years old (and, hopefully, still young enough to help ease his transition home), and his sons (now ages 4 and 9) will be 25 and 30 years old, respectively. The sentence will ensure that Mr. Larose misses the entirety of his sons' childhoods and the formative years of their young adulthood—an enormous sanction that sends a strong deterrent message to him and the community—while also giving Mr. Larose, who has accepted complete responsibility for his conduct, the opportunity to come home when his support network is still intact. A longer sentence will mean Mr. Larose's mother may be too old or unwell to help Mr. Larose when he comes home, leaving him without his primary supporter and ill-serving the community into which he will eventually need to transition.

A sentence of 25 years also ensures that Mr. Larose's sentence falls in line with sentences imposed on defendants with similar records, who were convicted of similar offenses. The sentence the government seeks—40 years—is the exact kind of sentence this Court has repeatedly undone when presented with the rare opportunity to do so. *See infra* Part IV.B. This Court cannot assume that it will ever have the opportunity to reconsider Mr. Larose's sentence; the sentence it imposes later this month must stand the test of time. A sentence of 25 years is sufficient, but not greater than necessary, to accomplish the goals of sentencing under 18 U.S.C. § 3553(a).

I.      **A sentence of 25-years incarceration is, effectively, within the guidelines range.**

As set forth in the Presentence Report ("PSR"), the base offense level is 43 under U.S.S.G. § 2A1.1(a).  PSR ¶ 23.  No offense-specific enhancements apply; Mr. Larose was not a leader or organizer, nor did he obstruct justice.  PSR ¶¶ 24-27.  Subtracting three levels for acceptance of responsibility, the final offense level is 40.  PSR ¶¶ 30-32.  Regardless of whether his criminal history category is IV or VI, *see* PSR ¶¶ 41-42,[2] with a final offense level of 40, the advisory guidelines range is 360 months-life.

Although Mr. Larose is asking the Court to impose a 25-year sentence, he is effectively asking for a guideline sentence of 30 years after factoring in the 5-year sentence he received for a related state case.  PSR ¶ 39.  As noted in the PSR, on November 20, 2020, Mr. Larose was arrested for firearm possession with felony conviction and, the following year, received a sentence of five years of incarceration.  PSR ¶ 39.  That conviction represents relevant conduct to the instant case, as the conviction stems from evidence seized as a result of a search warrant executed during the course of the investigation into the murder of Mr. Ross.  *See* U.S.S.G. § 1B1.3.  Indeed, had Mr. Larose proceeded to trial in the instant case, the government would have undoubtedly sought to present the evidence seized from the search warrant, including the evidence that formed the basis of the state conviction.

In determining the appropriate sentence for Mr. Larose, this Court can, and should, consider the five-year sentence he received for the related state case, as none of that time will count towards the sentence this Court imposes.  *See* 18 U.S.C. § 3585 (stating that a defendant shall be given credit towards his federal sentence for time spent in official detention prior to the date the federal sentence commences, but only if the time has not yet been credited against another sentence).  In this situation, U.S.S.G. § 5G1.3 recommends that the Court adjust the federal sentence to account for the sentence on the related state case.[3]  Thus, this Court should adjust the federal sentence to account for Mr. Larose's 5-year related state sentence.  Doing so, the Court should impose a 25-year sentence, which, together with the sentence on the related state case, results in a total sentence of 30 years.  That is, effectively, a guideline sentence.

---

[2]      The PSR determines that Mr. Larose has eight criminal history points, establishing a criminal history category of IV.  PSR ¶ 41.  (Three of those points are due to a conviction for a related state offense, *see infra* at 2-3; without those points, Mr. Larose would have five criminal history points, establishing a criminal history category of III.)  However, the PSR determines that a higher criminal history category of VI ultimately applies because Mr. Larose has two prior controlled substance offenses—both non-violent, low-level convictions for possession with intent to distribute controlled substances, incurred when Mr. Larose was 18 and 19 years old, respectively, for which he served minimal prison time.  PSR ¶¶ 37-38, 42.

[3]      *See also*  https://www.ussc.gov/sites/default/files/pdf/training/Podcasts/5G13_quick-guide.pdf.

II.     **A sentence of 25 years in prison avoids unwarranted sentencing disparities with an equally culpable co-defendant, whose c-plea agreement with the government calls for a prison term of 20 to 25 years**

A 25-year sentence not only effectively falls within the guidelines range, but it also avoids unwarranted sentencing disparities with Mr. Larose's co-defendant, Mr. Braxton, whose c-plea agreement with the government calls for a prison term of 20 to 25 years. *See* ECF No. 113 ¶ 9. Mr. Braxton and Mr. Larose engaged in extremely similar conduct and played similarly culpable roles in this case; indeed, if anything, Mr. Braxton's role was more aggravated because it was Mr. Braxton, and the multiple individuals he solicited, who ultimately carried out the murder of Mr. Ross.

Simply put, this offense would not have happened without Mr. Braxton. As set forth in the parties' plea agreement, Mr. Larose solicited an individual for the shooting, but the individual backed out. ECF No. 117-1 at 2. When that happened, Mr. Larose reached out to Mr. Braxton. *Id.* at 2-3. Mr. Braxton then solicited co-defendant Daquante Thomas and a second, unidentified individual to commit the murder. *Id.* at 3-4. Thus, while Mr. Larose solicited two individuals (the first individual, and then Mr. Braxton) to carry out the shooting, so too did Mr. Braxton (Mr. Thomas, and then the second, unidentified individual). And, while Mr. Larose was unable on his own to find anyone to carry out the shooting, Mr. Braxton found not just one, but two people to engage in the offense conduct. Mr. Braxton was also physically present with Mr. Thomas and the unidentified co-conspirator the day of the shooting to ensure it was carried out. It was Mr. Braxton's planning, oversight, and connections that ensured the shooting happened.

Even if the Court disagrees, however, that Mr. Braxton's role was more aggravated than that of Mr. Larose, the 40-year sentence requested by the government is excessive in light of the sentencing range in Mr. Braxton's plea agreement. The government cannot credibly claim that Mr. Braxton's conduct merits a 25-year sentence, but Mr. Larose's conduct deserves a prison term a full decade and a half longer. To the extent there are meaningful differences in Mr. Larose's and Mr. Braxton's conduct—which there are not—the fact that Mr. Larose will, effectively, serve a total 30-year sentence after accounting for the related state sentence, appropriately distinguishes their conduct. The total 30-year sentence would, therefore, reasonably place Mr. Larose between Mr. Braxton (whose c-plea agreement calls for a maximum term of 25 years) and Mr. Thomas (who actually carried out the shooting and received a sentence of 35 years).

In sum, a 25-year sentence avoids unwarranted disparities with Mr. Larose's co-defendants.

**III.    A sentence of 25-years incarceration takes into account Mr. Larose's profound trauma history stemming from the catastrophic 2010 earthquake in Haiti, which completely upended his family and altered the trajectory of his young life, as well as his total acceptance of responsibility for his actions in this case and his capacity for change and rehabilitation.**

Mr. Larose and his family were forever changed by the catastrophic earthquake in Haiti in 2010.  After surviving the earthquake and witnessing the devastating aftermath—including people crushed in the rubble and dead bodies being transported to the mortuary—Mr. Larose, then 14, became numb and detached.  He never received any counseling or even talked about what happened.  Instead, Mr. Larose began self-medicating with marijuana in order to feel even more disconnected from his pain.  It is against this backdrop that Mr. Larose made decisions that he will regret for the rest of his life and that ultimately claimed the life of another.  Mr. Larose is deeply remorseful for his actions, and knows that nothing he can say or do will bring back Mr. Ross or ease his loved ones' pain.  But, while the offense conduct is extremely serious and has caused enduring harm, this Court must remember that it is sentencing a whole person, and not just a crime.  Mr. Larose cannot be reduced to the worst thing he has ever done.  He is a loving and devoted father, a beloved son, and a positive force in the lives of other family members.  He is capable of redemption and worthy of a second chance.

### A.    Mr. Larose's Life Before the Earthquake

Jourdain was born to Nadege Larose and Jean Raymond Baussant in Haiti on February 9, 1995.  He is the only child born to his parents' union.  On December 16, 1996, when Jourdain was nearly two years old, he and his parents immigrated to the United States, first settling in Howard County, Maryland.

Jourdain's family moved around frequently during his early childhood.  Ms. Larose wanted Jourdain to start school as early as he could.  Given that children are permitted to start school at age two in Haiti, Ms. Larose sent Jourdain to Haiti when he was four years old so that he could enroll in school.  Accordingly, about two years after arriving in the United States, Jourdain returned to Haiti with his father; Ms. Larose remained in the United States.  Jourdain lived with his father in Haiti from ages four to six.  He then returned to Maryland to start school here.  When Jourdain started school in Maryland after living in Haiti, he struggled with English.  Jourdain was bullied in elementary school due to his language difficulties.

The family eventually moved from Maryland to North Port, Florida.  But just a couple years later, they returned to Maryland for better-paying jobs.  Not long thereafter, Mr. Baussant decided to return again to Florida, and Ms. Larose and Jourdain moved back there to be with him.  Jourdain did not like living in Florida.  In 2006, when they visited Ms. Larose's parents in Maryland, Jourdain, then age 11, told his mother that he did not want to go back to Florida.

Around this time, Ms. Larose's relationship with Jourdain's father was deteriorating, and she decided that it would be best for her and Jourdain to stay in Maryland.

From that point on, Jourdain's father's involvement in his life was minimal. Jourdain's father visited Maryland a total of two times—once shortly after he and his mother moved back and the next time for Jourdain's high school graduation in 2013. Ms. Larose described their phone contact as "scarce." She stated that Jourdain's father is a very "touchy" subject for him. Jourdain refers to his father as a "sperm donor."

Given Jourdain's father's minimal support of him, Ms. Larose raised Jourdain primarily as a single mother. His father did not help financially. Over the years, Ms. Larose supported Jourdain by working various retail jobs, including at Staples, Wendy's, the Doubletree Hotel in Columbia, and Walmart.[4] The family struggled financially. They moved between lower-income neighborhoods in Howard and Baltimore Counties, where Jourdain was exposed to drugs and violence. But despite the challenges they faced, Ms. Larose worked hard to make sure Jourdain always had the necessities, and she also supported his athletic endeavors.

Growing up, Jourdain loved sports. He participated in swimming and tennis, but was most passionate about basketball and football. Jourdain started playing football when he was nine years old, and he played throughout high school. Ms. Larose recalled, "you could not pull Jourdain out of sports." Jourdain "didn't accept not being taken to practice," as he was so passionate and dedicated.




---

[4]     Ms. Larose worked at Walmart for 15 years prior to having an accident at work three years ago that left her with severe back pain. She now works as an Uber driver.

 

*Mr. Larose as a student athlete.*

Jourdain aspired to play professional football before his life was completely upended by the devastating 2010 earthquake in Haiti.

## B.     The Catastrophic Earthquake

On January 2, 2010, Ms. Larose's father, Philistine Larose, died.  It was his dream to be buried in his home country of Haiti.  On January 11, 2010, Ms. Larose, Jourdain (who was then 14 years old), and extended relatives, including his cousins who also lived in Maryland, traveled to Port-au-Prince, Haiti, for Mr. Larose's funeral and burial.  The next day, on January 12, 2010, Haiti was devastated by a 7.0 magnitude earthquake.  Over 200,000 people were killed.

Jourdain and Ms. Larose were in a house when the earthquake hit and were able to escape harm.  Jourdain's cousins, Willermine (age 11) and Philip (age 9), were crushed by rubble and killed.[5]  Their mother was also killed.  Jourdain was close with Willermine and Philip, and their loss was enormously traumatic.

Following the earthquake, Ms. Larose recalled Jourdain running in the middle of the streets, crying, and saying, "Who is going to help these people?"  He asked about FEMA and health insurance.  Ms. Larose could not assure him that the people would be helped.

Jourdain and Ms. Larose were near a mortuary in Port-au-Prince, and over the next few days, they saw many dead bodies being transported.  Ms. Larose could not bring herself to stay for the extraction of her niece and nephew's bodies.  She took Jourdain to the U.S. Embassy on

---

[5]      *See* NBC Washington, *Two Ft. Meade Kids Lost in Haiti Rubble* (Jan. 21, 2010), *available at* https://www.baltimoresun.com/2010/01/21/marylander-loses-two-children-to-quake/ (attached as Exhibit 1); Nicole Fuller, *Marylander loses two children to quake*, Baltimore Sun (Jan. 21, 2010), *available at* https://www.baltimoresun.com/2010/01/21/marylander-loses-two-children-to-quake/ (attached as Exhibit 2).

January 17, 2010, and they returned to Maryland.  Ms. Larose noticed that Jourdain became more reserved after returning to Maryland.

Ms. Larose mother informed Jourdain's father that they were alive after the earthquake. Jourdain's father did not reach out to him to check on his well-being or express his love for him.

Jourdain has refused to return to Haiti since 2010.  Ms. Larose goes back almost every January to visit Willermine and Philip's graves.  Jourdain always begs her not to go.  He has never processed his experience of the earthquake in a therapeutic setting; he was never offered counseling services, as he was not an immediate family member.  Jourdain prefers not to talk about the experience at all.

Ms. Larose recalled that the "whole family fell apart" after the earthquake.  Before the earthquake, they were "all connected" and gathered frequently.  But after the trauma of the earthquake, the catastrophic loss of Jourdain's cousins and aunt, and their exposure to death on an incomprehensible scale, the family became emotionally detached and distant.  Jourdain's uncle Moise—who was like a father to him—lost his son and daughter in the earthquake and became "totally out of it."  Jourdain's family members were so traumatized that they had "no feelings left for outsiders."  The earthquake's "toll of disconnection" on Jourdain's family was beyond words.

### C.   Mr. Larose's Life in the Aftermath of the Earthquake

Jourdain's world completely shifted after the earthquake.  His aunt, Dorina Larose, noticed a visible change in him: "after the tragedy[,] he wasn't the same bubbly, happy, Jourdain I knew."  Exhibit 3 (Letter from Dorina Larose).

After Jourdain returned home from Haiti, he began using marijuana as a way to numb his grief and pain.  Eventually, he was using marijuana on a daily basis; by the time of his arrest in the instant case, he was using marijuana constantly.  Jourdain was once hospitalized for stomach issues, which he believed were related to his marijuana usage.  Jourdain also sought to distract himself from his pain by engaging in gambling, which quickly became an addiction.  In 2012, when he was 17 years old, Jourdain incurred two juvenile charges in close succession.  PSR ¶¶ 34-35.  Though he received probation for both cases, they rendered him ineligible for sports scholarships and effectively ended his dream of playing college football.  Jourdain narrowly graduated high school with a 2.04 GPA.



*Mr. Larose with his parents at his high school graduation in 2013.*
*It was only the second time since his parents separated in 2006 that he had seen his father.*

After high school, Jourdain took courses at Howard Community College. He liked college a lot more than high school. He found that the classes he took in high school were not useful in the real world, whereas his college courses were. But in 2013, when Jourdain was 18 years old, he was expelled from college after he incurred a charge for CDS: possession with intent to distribute, for which he received a sentence of 6-months incarceration. PSR ¶ 37. He quickly received his second adult conviction in 2014, when he was 19 years old, for another low-level, non-violent drug conviction. PSR ¶ 38.

Jourdain's criminal history became a significant barrier to his success in adulthood. In addition to being expelled from Howard Community College, Jourdain was turned away from many job opportunities due to his convictions. Over the years, he worked at Burger King, as a security guard at a mall in Baltimore, as a stocker at Target in Columbia, and for a mobile car cleaning service. The jobs were all minimum wage and not enough to live on.

Just as Jourdain was struggling to envision and build a future for himself, he became a father. When Jourdain was 19 years old, his long-term girlfriend, Danasia Thomas, became pregnant with their first son, Adrian. About five years later, the couple welcomed their second son, Kayden. Jourdain is a doting father, who has been an active presence in his sons' lives. He

9

has strived to give his children the love, support, and stability he never received from his own father. He loves playing sports with his boys, and even coached his son Adrian's football team.



*Mr. Larose with his sons, Adrian and Kayden, and his mother, Nadege Larose.*

Mr. Larose's loved ones attest to his devotion to his sons, his generosity and selflessness, his resilience, and his strong sense of personal responsibility:

- "[Jourdain] is always one phone call away, willing to give you the clothes off his back, and the last dollar in his wallet.  That's the person I grew up with.  In regards to his parenting, those same characteristics shine through and resonate with his children. . . . Jourdain is active in his children's growth and development both as young boys and young black boys growing up in the United States.  He consistently provided educational tools and support, presence at sporting events, and emotional support.  This was not the same leadership provided to Mr. Larose. . . .  I believe in my cousin and his ability to have a positive change.  At his core, he is a good person and can put a good foot forward to taking responsibility and in turn contributing to society."  Exhibit 4 (Letter from Amy Altona).

- "One of the most testing moments in our lives was the shared experience of surviving the 2010 earthquake in Haiti that resulted in significant loss within our family.  The aftermath of such a traumatic event added another layer of complexity to our lives. . . . Yet, despite these hurdles, Mr. Larose exhibited extraordinary strength to overcoming obstacles.  Not having the role of his father I believe allowed him to learn how to be the best father he could to his two sons later in life.  His unwavering support for his children's emotional, educational and social growth definitely set him apart from his own personal absent father.  He continues to lead by example, demonstrating the importance of taking responsibility, knowing the importance of hard work, integrity and hard work despite adversity. . . .  As Mr. Larose faces this new leaf of life, I am confident that he will continue to demonstrate the same resilience, tenacity, and grace that has characterized his journey thus far."   Exhibit 5 (Letter from Myshirloise "Diana" Catherine Larose).

- "Throughout our lives, I have known Jourdain Larose to be a person of integrity, kindness, and resilience.  Jourdain Larose has always demonstrated a strong sense of responsibility and accountability.  Despite the current circumstances, I believe in his ability for growth and positive change. . . .  I genuinely hope the court considers Jourdain Larose['s] potential for redemption."  Exhibit 6 (Letter from Andy Altona).

- "Jourdain was [] very supportive in my journey to becoming a business owner and I will be forever grateful for the motivation and the level of support he was able to give me while being incarcerated. . . .  Jourdain demonstrates amazing qualities as a man and has always been respectful towards me for all of the years that I've known him.  He is a very caring and reliable person, as he would always be there for his family and friends.  He would always extend compassion to others, and would act with empathy, to help one overcome any of their obstacles. . . .  I believe that Jourdain will continue to build on his hard-working abilities once he is sentenced and upon release from prison, those strengths will help him to stay focused on his future and his children."  Exhibit 7 (Letter from Kayla Wongus).

- "[Jourdain] is the best father figure.  The ability to show your kids genuine authentic love while not having a father in your life made me look up to him as a cousin."  Exhibit 8 (Letter from Marvan Larose).

- "[Jourdain] will strive to make amends, and I am sure we will get to see his good works bringing fruitful results to our society again."  Exhibit 9 (Letter from Magalie Decius).

Jourdain's actions in this case, which will weigh on him for the rest of his life, are totally contrary to his morals and values.  He knows that he must dedicate his life to making amends for the loss of Mr. Ross's life and the pain caused to his loved ones.  He has accepted complete responsibility for his conduct, before litigating any pretrial motions, demonstrating his seriousness about quickly taking accountability for his actions.  His remorse and acceptance of responsibility should factor heavily in this Court's sentencing analysis, as should his potential to live a law-abiding and productive life as a much older adult when he eventually comes home from prison.  Should the Court impose the requested 25-year sentence, Jourdain will come home as a 50-year-old man, whose risk of recidivism will be significantly diminished.  *See* U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 22 (Dec. 2017).[6] Jourdain's actions as a young man in his 20s, still in the midst of brain development, are not reflective of his ability to succeed during a lengthy period of supervised release as an adult in his 50s.  *See* Jeffery Jensen Arnett, (Ed.) *The Oxford Handbook of Emerging Adulthood,* Oxford University Press (1st ed. 2015) (explaining that emerging adulthood, the time period from ages 18 through 25 when the brain continues to undergo major changes, is marked by unique challenges that affect health, including burgeoning occupational, relational, and financial stability and increased risk taking).

This Court should impose a 25-year sentence to reflect that Jourdain is capable of redemption and worthy of an eventual second chance.  As the sentences discussed below demonstrate, this Court routinely imposes sentences that allow individuals who accept responsibility for their conduct a second chance in society.  *See infra* Part IV.A.

IV.    **A sentence of 25-years incarceration avoids unwarranted sentencing disparities with similarly-situated defendants sentenced today, both in the first instance and pursuant to Section 404 of the First Step Act and/or 18 U.S.C. § 3582(c)(1)(A).**

The 25-year sentence Mr. Larose seeks is commensurate with what people in the District of Maryland receive for similar conduct.  Indeed, judges in this District routinely impose sentences around 25 years (and sometimes less) for defendants who were older than Mr. Larose at the time of the offense conduct, had a similar (or more substantial) prior record, were found to

---

[6]    Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

have committed a murder (or multiple murders), and <u>even for defendants who refused to accept</u> <u>responsibility for their actions and were convicted by a jury after lengthy and emotionally-</u> <u>punishing trials.</u>

As discussed below, judges in this District have repeatedly exercised their authority under Section 404 of the First Step Act and/or 18 U.S.C. § 3582(c)(1)(A) to impose sentences of around 25 years for defendants who, unlike Mr. Larose, were convicted after a jury trial and whose conduct was equally (or more) aggravated than the conduct involved in this case. *See infra* Part IV.B. Section 404 of the First Step Act and 18 U.S.C. § 3582(c)(1)(A) afforded the Court with an extremely rare opportunity to reconsider certain lengthy sentences imposed long ago. Section 404 enabled defendants who were convicted of certain pre-2010 crack cocaine offenses to ask the Court for sentencing relief, while § 3582(c)(1)(A) allowed defendants to ask for sentencing relief based on "extraordinary and compelling reasons." Both laws were lightning strikes, representing a highly unusual opportunity for federal judges to reconsider sentences in a system where there is no parole or any mechanism for reconsideration.

In Mr. Larose's case, he will not be eligible for Section 404 relief because he has not been convicted of a crack-cocaine offense. Nor will he be eligible for § 3582(c)(1)(A) relief unless the Court determines that he establishes "extraordinary compelling reasons" for relief, his release would not pose a danger to the community, and the § 3553(a) factors weigh in favor of a sentence reduction. Thus, this Court cannot assume that it will ever have the opportunity to reconsider the sentence it imposes in Mr. Larose's case. This Court must ensure that the sentence it imposes today is not one it will wish to reduce later; there is no basis to assume the Court will have the ability to reconsider the sentence at a later date.

A sentence of 25 years satisfies this Court's obligation to ensure Mr. Larose's sentence is consistent with sentences imposed on individuals with similar records, who were convicted of similar offenses. A lengthier sentence would be the exact kind of sentence this Court has repeatedly undone when presented with the rare opportunity to do so.

### A. Sentences Imposed in the First Instance

The 40-year sentence the government seeks is totally out of step with the sentences imposed in just as serious (or more serious) cases heard in this District. In 2022, the District of Maryland sentenced 24 defendants in cases involving murder. *See* U.S Sent'g Comm'n, *Statistical Information Packet, Fiscal Year 2022, District of Maryland*, at 3.[7] Seventeen of those sentences followed a guilty plea, and seven followed a trial. *Id.* at 7. The mean sentence for murder in Maryland's federal court was 286 months, and the median was 213 months. *Id.* at 11. It bears noting that Maryland federal homicide sentences fall well above the national mean (261

---

[7] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/md22.pdf.

months). *Id.* Thus, the data highlight just how disproportionate the government's sentencing request is in Mr. Larose's case.

Indeed, even in cases involving multiple, brutal murders/shootings, the Court routinely imposes sentences drastically less than the 40-year sentence requested by the government in this case. For example:

- In *United States v. Brandon Bazemore*, No. CCB-16-0597, the defendant was involved in a years-long drug conspiracy carried out by a violent gang known as "Trained to Go." Mr. Bazemore, along with other members of the gang, was solicited to carry out a murder in exchange for about $10,000. He and other members the gang, clothed in gloves and masks and carrying multiple firearms, traveled along West Fayette Street in order to locate the victim. Once they located the intended victim, Mr. Bazemore and the other individuals exited their vehicle and fired dozens of rounds at the victim. The victim suffered 13 gunshot wounds to the head, face, chest, neck, and forearms, and was pronounced dead at the scene. Two other individuals—one of whom suffered 13 gunshot wounds to the legs, forearms, buttocks, neck, and chest and the other of whom (a 55-year-old woman) suffered 11 gunshot wounds to the abdomen, chest, and hands—were transported to Shock Trauma, where they died. A fourth victim was shot in the buttocks, but survived. The Court sentenced Mr. Bazemore, who was involved in three murders and one attempted murder, to 25 years—the exact sentence Mr. Larose seeks for his involvement in a single murder. Only co-defendants convicted after a jury trial received a sentence greater than 25 years, and even some co-defendants convicted by jury still received terms of years ranging from 25-30 years.

- In *United States v Garrion McCellan*, No. CCB-16-0235, the defendant, a member of the Black Guerilla Family, was convicted of conspiracy to possess with intent to distribute and to distribute controlled substances and possession of a firearm in furtherance of a drug trafficking crime causing death. Mr. McCellan admitted to committing two separate murders (both of which were committed in expectation of payment) and badly injuring a third person. One of the murders was meticulously planned. Mr. McCellan received a sentence of 25 years—again, the same sentence Mr. Larose seeks.

- In *United States v. Christopher Dukes*, No. GLR-16-0453, the defendant entered a plea in which he admitted to attempting to strike a law enforcement officer with his car, participating in the shooting and killing of one person and shooting of another individual, and participating in the killing of yet another individual. The Court sentenced Mr. Dukes to 23 years—two years less than the sentence Mr. Larose requests. Co-defendants received sentences ranging from 240 months to 360 months.

- In *United States v. Asim Benns*, No. GLR-13-0677, the defendant pled guilty to conspiracy to participate in a racketeering enterprise, admitting that he planned and/or

14

participated in the murders of two rival gang members and two other shootings, ran a heroin shop, distributed drugs, and robbed two banks. The Court sentenced Mr. Benns to 23 years—again, two years less than the sentence Mr. Larose requests.

Another co-defendant, Elijah Sykes-Bey, received a sentence of 24 years, despite admitting to participating in the murders of two rival gang members. Co-defendant Gregory Sykes-Bey similarly received a sentence of 24 years, despite admitting to two shootings and the murder of a rival gang member.

- In *United States v. Cortez Weaver*, No. RDB-19-0144, the defendant admitted to shooting a member of a rival drug organization in the head at close range at a gas station. It was a little after 7:00 p.m., and the sun was shining. Surveillance footage from the gas station showed Mr. Weaver skip down the street to where the victim was standing and shoot him in the back of the head. Mr. Weaver then immediately turned and attempted to murder an unknown bystander, chasing him up the street and firing at least ten rounds at him. Meanwhile, a co-defendant attempted to murder another individual, shooting him multiple times and causing life-threatening injuries. Mr. Weaver later bragged about the murder to multiple people. Mr. Weaver was apprehended following a sting operation, during which he plotted to rob a group of drug dealers. In conversations with an undercover agent, Mr. Weaver made clear his intent to kill the individuals whom he expected to be guarding the drug stash house. The Court sentenced Mr. Weaver to 30 years—a full decade less than the government's sentencing request in Mr. Larose's case.

- In *United States v. Carlos Alas Brizuela*, No. JKB-16-0259, the defendant, as a member of the MS-13 gang, participated in and orchestrated multiple murders and kidnappings. In April 2015, Mr. Brizuela was contacted by fellow members of MS-13, who informed him of a potential victim they wanted him to kill. Mr. Brizuela then contacted other gang leaders to get approval to kill the victim, and subsequently enlisted the help of another gang member to participate in the murder of the victim. MS-13 members lured the victim to a wooded area, where they disabled him by hitting him in the head with a rock and then striking him repeatedly with a machete and a knife until he died. During the attack, MS-13 members called Mr. Brizuela to confirm that they should kill the victim. The victim was later discovered buried in the woods, near the site of the murder.

In May 2015, Mr. Brizuela and other members of MS-13 kidnapped another victim for the purpose of killing him because he was not making money payments to the gang. They ultimately let the victim live when he agreed to pay the gang immediately.

In August 2015, members of MS-13 identified yet another victim to kill because they believed he was a member of a rival gang. They sought permission from Mr. Brizuela to kill the individual. Over the course of several days, the gang members surveilled the area where the victim lived with his girlfriend. Three gang members

attacked both the victim and his girlfriend.  Both individuals survived, but the attack left one victim with both hands nearly severed and severe wounds to his face and torso.

At the end of August 2015, Mr. Brizuela participated in yet another murder—committed because the victim was wearing a particular type of sneakers that Mr. Brizuela had warned him before not to wear.  Mr. Brizuela and other MS-13 members spotted the victim while at Dunkin Donuts.  They chased the victim down and stabbed him to death.

The Court sentenced Mr. Brizuela to 32 years in prison—nearly a decade less than the government's recommended sentence in Mr. Larose's case.

The above sentences show that a 40-year sentence for Mr. Larose, or anything approaching it, would create unwarranted sentencing disparities, in direct contravention of this Court's § 3553(a) obligation to ensure consistency in sentencing for defendants with similar records who were convicted of similar offenses.

## B.   Sentences Imposed Pursuant to Section 404 and/or § 3582(c)(1)(A)

The 40-year sentence the government seeks—which the U.S. Sentencing Commission considers the equivalent of a life sentence[8]—is exactly the kind of sentence that this Court has repeatedly undone when presented with the opportunity to do so.  Using its authority under Section 404 and/or § 3582(c)(1)(A), this Court has repeatedly imposed reduced sentences of around 25 years (and sometimes) less for defendants who, unlike Mr. Larose, refused to accept responsibility for their conduct, held the government to its burden, and forced lengthy, emotionally taxing trials on brutal facts.  This includes cases involving contract killings, which were motivated by retaliation for the victim's cooperation with law enforcement:

- In *United States v. Gray*, No. CCB-95-0364, 2021 WL 1856649 (D. Md. May 10, 2021), the Court reduced the life sentence for David Gray, who in 1996 was found guilty following a jury trial of murder in aid of racketeering and possession of a firearm in furtherance of a crime of violence, an offense he committed when he was 23 years old. Describing Mr. Gray's offense as "chilling," the Court explained that he, "at the best of a drug dealer and with the prospect of some significant financial gain, planned and committed what amounted to the execution of Jamie Lee Waller." *Id.* at *4.  Mr. Gray, together with two other individuals, located and "ambushed" Waller and two other men. *Id.* at *1.  At least 29 shots were fired at the three victims; "Waller was killed in the gunfire, and the two men with him were seriously injured." *Id.*  The Court, balancing the extremely serious nature of the offense conduct and the fact that Mr. Gray "was 'deeply involved' in the drug trade in Baltimore" (as evidenced by multiple prior convictions

---

[8]      The U.S. Sentencing Commission considers a 470-month prison sentence—ten months less than the sentence the government is requesting in Mr. Larose's case—the equivalent of a life sentence.  *See* https://www.ussc.gov/policymaking/meetings-hearings/appendix.

resulting in a criminal history category V) against his difficult upbringing and his relative youth at the time of the shooting, reduced his sentence under § 3582(c)(1)(A) to time served (about 26 years).  *Id.* at *4.

- In *United States v. Williams*, No. CCB-07-0402, ECF No. 143 (D. Md. Aug. 23, 2021), the defendant—who was convicted following a jury trial—was sentenced pursuant to the U.S.S.G. § 2A1.1 cross-reference for murder based on a finding at sentencing that he ordered the murder of a woman who was cooperating against him.  The woman had previously reported to police that Mr. Williams had contacted her on her cell phone and had driven by her work, stared into the business at her, and drove off.  The morning after reporting those safety concerns, the woman was shot to death at the motel where she was living in Aberdeen.  Police received information establishing that Mr. Williams ordered the murder of the woman in retaliation for her cooperation with law enforcement and to eliminate her presence at trial.  Mr. Williams, who was 27 years old at the time of the murder, had 18 criminal history points, establishing a criminal history category of VI.  He was sentenced to life in prison without parole.  Mr. Williams later moved for sentencing relief under Section 404 of the First Step Act.  The Court, noting that "[c]ourts in this district routinely impose sentences within the thirty-year range on defendants involved in drug-related killings," reduced Mr. Williams' life sentence to 360-months imprisonment. *Id.* at 7.

- In *United States v. Cheese*, No. ELH-98-0359, ECF No. 911 (D. Md. July 2, 2020), the Court reduced the life sentence for Alfred Cheese, who, as a man in his early thirties, was part of a "very violent" drug-trafficking organization, "particularly with respect to rival drug dealers and potential witnesses."  *Id.* at 2.  At trial, the government presented evidence of numerous attempted and completed murders during the course of the drug conspiracy, one of which—a contract killing for which Mr. Cheese "produced the money that was paid to [a co-defendant] in recompense for the murder"—led to the application of the cross-reference under § 2A1.1.  *Id.* at 7 (internal quotation marks omitted).  At sentencing, Mr. Cheese received a three-level leadership enhancement, as well as a two-level upward adjustment because the government claimed that he attempted to have witnesses killed prior to and while being detained.  Based on a final offense level of 43 and a criminal history category VI (Mr. Cheese was deemed an armed career criminal but had 15 criminal history points, triggering a category VI even without the enhancement), Mr. Cheese faced a guidelines range of life.  The Court reduced his sentence under Section 404 to 28 years, and later granted a further sentence reduction under § 3582(c)(1)(A) to time served, resulting in Mr. Cheese's release after slightly less than 23 years in continuous custody.

- In *United States v. Martin*, No. RDB-04-029, ECF No. 868 (D. Md. July 27, 2021), the defendant was charged with a number of drug and firearms offenses based on his involvement in a drug-trafficking organization, including two counts of murder in aid of racketeering and two counts of possession of a firearm in furtherance of drug trafficking and a crime of violence resulting in death.  The murder counts related to the shooting deaths of two individuals from a rival drug-trafficking organization, which occurred when Mr. Martin was 23 years old.  Mr. Martin proceeded to trial and was acquitted of

murder, but was found guilty of drug and racketeering charges. Although Mr. Martin was acquitted of the murder counts, the Court nevertheless calculated his guidelines under § 2A1.1. The Court imposed a total sentence of 400 months in prison. Mr. Martin later moved for a sentence reduction pursuant to Section 404, but the government opposed relief, arguing that Mr. Martin had "behaved poorly in prison, incurring a total of seventeen disciplinary infractions, including seven citations for possession of narcotics or alcohol and – even more alarming – two citations for possessing a dangerous weapon and three citations for fighting with another person." ECF No. 864 at 12. The Court reduced Mr. Martin's sentence anyway, finding that a sentence of 300 months would be "consistent with this Court's current sentencing practices for similar crimes." ECF No. 868 at 8.

- In *United States v. Fleming*, No. ELH-08-086, ECF No. 1836 (D. Md. Mar. 11, 2022), the defendant was convicted following a jury trial, and sentenced pursuant to U.S.S.G. § 2A1.1 based on findings at sentencing that he murdered an individual in retaliation for the individual's testimony against a fellow member of the Bloods gang, as well as a second individual who refused to pay money to the gang. *Id.* at 4-5, 9. Mr. Fleming had 9 criminal history points, establishing a criminal history category of IV. *Id.* at 8. He was sentenced to life in prison without parole. Mr. Fleming later moved for sentencing relief under Section 404 of the First Step Act and 18 U.S.C. § 3582(c)(1)(A). The Court reduced his sentence to 360-months incarceration, noting that, although Fleming "has accumulated a number of disturbing disciplinary infractions" and his "offenses [] were extraordinarily grave," his "sentence of life imprisonment is far in excess of more recent sentences in this District for similar offenses." *Id.* at 48, 50.

- In *United States v. Babb*, No. ELH-04-0190, ECF No. 275 (D. Md. June 7, 2021), the defendant was charged with a number of drug and firearms offenses based on his involvement in a "drug trafficking organization that distributed large quantities of powder cocaine and cocaine base in Maryland," including two counts of use of a firearm to commit murder in furtherance of a drug-trafficking crime. *Id.* at 3. The murder counts related to the shooting deaths of two victims, whose bodies were discovered in the trunk of a car driven by Mr. Babb's co-defendant. Mr. Babb was convicted at trial of all counts except for the murder counts. Nevertheless, at sentencing, the Court found that, "at a minimum, Mr. Babb was an aider and abettor to the actual murder[s]" and, thus, calculated his guidelines under § 2A1.1. Based on a final offense level of 43 and a criminal history category VI (Mr. Babb qualified as a career offender, but had 23 criminal history points, triggering a criminal history category VI even without the career-offender enhancement), Mr. Babb faced a guidelines range of life, and he received a sentence of life imprisonment plus five years. Mr. Babb later moved for a sentence reduction pursuant to Section 404 & § 3582(c)(1)(A). The Court determined that a sentence of 30 years was appropriate.

- In *United States v. Holland*, No. GLR-96-0399, ECF No. 661 (D. Md. Aug. 18, 2021), the government alleged that Mr. Holland was the "leader of a violent drug trafficking organization that was responsible for murders, robberies, and significant narcotics distribution." *Id.* at 2-3. Mr. Holland was charged with a number of drug and firearms

18

offenses based on his involvement in the drug-trafficking organization, including killing an individual while engaged in a drug conspiracy. Mr. Holland proceeded to trial and was convicted of all but one of the drug-related counts and the murder count. At sentencing, the Court found that 53 kilograms of crack and 30 kilograms of heroin were reasonably foreseeable to Mr. Holland. Additionally, the Court found by clear and convincing evidence that he had committed the murder charged by the government and calculated his guidelines under § 2A1.1. Based on a final offense level of 43 and a criminal history category III (Mr. Holland had prior convictions for assault and handgun violation, possession of heroin with intent to distribute, and marijuana possession), his guidelines range was life. The Court sentenced Mr. Holland, then 35 years old, to life in prison. Mr. Holland later moved for a sentence reduction under Section 404. The Court, considering that serious nature and circumstances of the offenses and the need for deterrence, reduced his sentence to 35 years. The Court also reduced the life sentences of Mr. Holland's co-defendants, Kevin Jones and Daniel Hill, who were also convicted following a weeks-long trial and subject to the § 2A1.1 murder cross-reference, to 330 months each.

- In *United States v. Brown et al.*, the Court reduced the life sentences for Bobby Brown, Thomas Carter, and Julius Brown to 37 years, 33 years, and time served, respectively. *See United States v. Julius Brown*, No. ELH-00-0100, ECF No. 465 (D. Md. Dec. 17, 2020); *United States v. Carter*, No. ELH-00-0100, ECF No. 424 (D. Md. Apr. 17, 2020); *United States v. Bobby Brown*, No. ELH-00-0100, ECF No. 414 (D. Md. Mar. 16, 2020); *see also United States v. Carter*, No. ELH-00-0100, ECF No. 503 (D. Md. Nov. 18, 2022); *United States v. Bobby Brown*, No. ELH-00-0100, ECF No. 486 (D. Md. Oct. 28, 2021). All three co-defendants were convicted of drug- and gun-related charges following a weeks-long jury trial, and Julius Brown was also convicted of threatening a witness. Additionally, Julius Brown had been charged with attempting to kill a witness, but the jury acquitted him of that count. Likewise, Bobby Brown and Mr. Carter were charged with committing a murder, but were acquitted of that count. At sentencing, Judge Davis found by clear and convincing evidence that Bobby Brown and Mr. Carter had committed the murder and that the murder was also reasonably foreseeable to Julius Brown as part of the drug conspiracy. Even before the application of the murder cross-reference under § 2A1.1, all three defendants faced offense levels above 43, with each defendant receiving a four-level leadership enhancement and both Julius Brown and Bobby Brown receiving obstruction of justice enhancements. Judge Davis imposed sentences of life plus 30 years for each of the three men.

In the case of Bobby Brown, weighing the § 3553(a) factors, including his leadership and obstruction enhancements, the fact that he had a substantial criminal history establishing a natural criminal history category of V (but triggering a criminal history category of VI under the career-offender provision), and his disciplinary record (which included two 100-level infractions for possessing a dangerous weapon, one 100-level infraction for assaulting with serious injury, and three 200-level infractions for fighting), the Court reduced his sentence under Section 404 to 40 years and later granted a further reduction under § 3582(c)(1)(A) to 37 years. Acknowledging Mr. Carter's more modest criminal history (his prior record resulted in a criminal history category III), the

Court reduced his sentence under Section 404 to 35 years, and later granted a further reduction under § 3582(c)(1)(A) to 33 years.  And, in the case of Julius Brown, the Court reduced his sentence under § 3582(c)(1)(A) to time served, despite his "extensive" criminal history and the fact that he was significantly older than his co-defendants (he was 50 years old at the time of the charged conspiracy).  Julius Brown was released after about 20 ½ years in custody.

In sum, defendants convicted following a jury trial of equally serious (or more serious) conduct ultimately received sentences far less than the 40-year sentence the government has requested in Mr. Larose's case.[9]  A 25-year sentence appropriately distinguishes Mr. Larose, who has promptly accepted full responsibility for his actions, from defendants who failed to take accountability for their conduct.

## V.      Conclusion

The loss of Mr. Ross is tragic and merits significant punishment.  But guided by § 3553(a)'s mandate for a sentence that is sufficient, but not greater, than necessary, this Court must ensure that that punishment is proportionate to sentences imposed in similar cases.  The government's sentencing request matches the draconian and excessive sentences that this Court has repeatedly undone in recent years.

A quarter century is a severe sanction that fully achieves the goals of deterrence, public safety, and respect for the law.  It is a tremendously long period of time to spend incarcerated away from loved ones; indeed, it is as long as Mr. Larose had been alive at the time of the offense.  For the reasons stated above, the Court should accept Mr. Larose's plea pursuant to Rule 11(c)(1)(C) and sentence him to 25 years in prison, followed by 5 years of supervised release.

We thank the Court for its attention to this matter.

---

[9]      The above cases do not even represent all the sentence reductions granted to individuals convicted after a jury trial and found responsible for a murder (or multiple murders).  *See also, e.g.*, *United States v. Aaron Foster et al.*, No. CCB-02-0410, ECF No. 775 at 2 (D. Md. July 7, 2023) (defendant was tried and convicted of multiple death-eligible charges; he was responsible for two "retaliatory" murders and was convicted of witness tampering for attempting to kidnap a witness, but the Court reduced his life sentence to 32 years and also reduced his two co-defendants' life sentences to 35 years each, *see* ECF Nos. 777 & 779); *United States v. Chapman et al.*, No. GLR-96-0458, ECF No. 1300 (D. Md. Nov. 3, 2021) (30-year sentence in a case where the defendant was convicted after trial of murder in aid of racketeering, a mandatory life offense; the Court also reduced the life sentences of two co-defendants, *see* ECF Nos. 1304 & 1322); *United States v. Linton*, No. JKB-98-0258, ECF No. 471 at 10 (D. Md. Sept. 27, 2021) (30-year sentence for defendant whose "crimes of conviction rank among the most serious offenses imaginable").

Sincerely,

/s/

Shari Silver Derrow
Elizabeth Lopez
Assistant Federal Public Defenders


cc:    Kim Oldham, Assistant U.S. Attorney
       Carissa Perez, U.S. Probation Officer